**In the Matter of D.L., A Juvenile.**

**No. 12–03–00071–CV.**

Court of Appeals of Texas, Tyler.

Feb. 23, 2005.

James J. Dewitt, Ebb B. Mobley, Longview, for appellant.

Sharon N. Pruitt, Irving, Renee F. Gartland, for appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J. and DeVASTO, J.

## *OPINION*

JAMES T. WORTHEN, Chief Justice.

A jury found that D.L., a juvenile, had committed six acts of aggravated sexual assault against five different victims and that he used or exhibited a deadly weapon during one of the incidents. He was sentenced to ten years of probation and was required to register as a sex offender pursuant to Chapter 62 of the Texas Code of Criminal Procedure. On appeal, D.L. rais-

es five issues relating to cruel and unusual punishment, the trial court's denial of his motions for severance and mistrial, the terms of his community supervision, and the sufficiency of the evidence to support the deadly weapon finding. We affirm.

### *Background*

Around the first of April in 2002, C.L. was sleeping with his grandmother, M.L. In the middle of the night, M.L. was awakened by C.L., who was "on all fours," still asleep, and crying out: "[B.S.], help me! Stop! Stop! [D.L.], you're hurting me! Stop it! Get off of me." C.L. was approximately four years old at the time.

The next morning, C.L.'s grandmother asked him if somebody "had been messing with him." C.L. told his grandmother that D.L. "put his thing up my ass. I was crying. I was trying to get away." Later in the day, M.L. questioned B.S. and S.L., two of C.L.'s older cousins, about whether they had "fooled" with C.L. The boys went outside for a short time. Upon their return, S.L. stated that it was D.L. and that D.L. "got both me and [B.S.]."

M.L. reported the information to the Gregg County Sheriff's Office. Detective Tim Bryan, the investigator who spoke to M.L., notified Child Protective Services and also set up interviews for C.L., S.L., and B.S. at the Child Advocacy Center of East Texas. In separate interviews, each child restated his allegations against D.L. At least one of the children told the interviewer that D.L. had also sexually assaulted another cousin, C.H., and a neighbor, R.H. All of the alleged victims were under the age of fourteen.

A grand jury certified the State's third amended petition in which it alleged that D.L. had engaged in delinquent conduct by committing aggravated sexual assault against C.H., S.L., B.S., C.L., and R.H. *See*

TEX. PEN.CODE ANN. § 22.021(a)(2)(B) (Vernon Supp.2004–2005) (aggravated sexual assault occurs where sexual assault is committed against a person who is younger than fourteen). The State also alleged that D.L. used or exhibited a deadly weapon, a knife, during the incident involving R.H. The matter proceeded to a jury trial. The jury found D.L. guilty on all counts and made a deadly weapon finding. D.L. was sentenced to probation for ten years and removed from his home. By agreement of the parties, D.L. was placed in the managing conservatorship of the Texas Department of Protective and Regulatory Services, who placed D.L. at a juvenile sex offender treatment facility. He was also required to register as a sex offender. This appeal followed.

### CRUEL AND UNUSUAL PUNISHMENT

■ Chapter 62 of the Texas Code of Criminal Procedure prescribes the registration procedure for persons convicted of sex-related offenses. The requirements of Chapter 62 apply to juveniles. TEX.CODE CRIM. PROC. ANN. art. 62.12(b)(1) (Vernon Supp.2004–2005). In his first issue, D.L. argues that Chapter 62 is unconstitutional on its face as a violation of the Eighth Amendment prohibition against cruel and unusual punishment for a juvenile.[1] See U.S. CONST. amend. VIII. The State counters that the reporting requirement is not punitive and therefore cannot constitute cruel and unusual punishment.

### Burden in Facial Challenges

■ A statute is presumptively constitutional. *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 629 (Tex.1996). If possible, we interpret a statute in a manner that renders it constitutional. *Id.* The burden of proof is on the party challenging the presumption of constitutionality. *Gen. Servs. Comm'n v. Little–Tex Insulation Co., Inc.*, 39 S.W.3d 591, 598 (Tex.2001). The party raising a facial challenge must demonstrate that the statute always operates unconstitutionally. *Wilson v. Andrews*, 10 S.W.3d 663, 670 (Tex.1999). In other words, the party must establish that no set of circumstances exists under which the statute would be valid. *In re B.S.W.*, 87 S.W.3d at 771.

### Constitutional Analysis

■ It is rudimentary that the Chapter 62 reporting requirements cannot be cruel and unusual punishment when applied to juveniles if the requirement is not punishment for constitutional purposes. *See Ex parte Robinson*, 116 S.W.3d 794, 797 (Tex. Crim.App.2003). Whether the provisions of a particular statute constitute punishment for constitutional purposes can be answered by application of what is known as the "intent-effects" test. *Rodriguez v. State*, 93 S.W.3d 60, 67 (Tex.Crim.App. 2002).

■ Under the "intent-effects test," a reviewing court must first ask whether the legislature intended the statute to be a criminal punishment. *Id.* If that question is answered in the negative, the court must then examine "whether the statutory scheme [is] so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." *Id.* (citing *Hudson v. United States*, 522 U.S. 93, 99, 118 S.Ct. 488, [493], 139 L.Ed.2d 450 (1997)). The manifest intent of a statute will be rejected only where the party challenging the statute

---

1. D.L. did not raise this issue in the trial court. However, a facial challenge to the constitutionality of a statute may be raised for the first time on appeal. *In re B.S.W.*, 87 S.W.3d 766, 771 (Tex.App.-Texarkana 2002, pet. denied).

provides the "clearest proof" that the statute is actually criminally punitive in operation. *Rodriguez,* 93 S.W.3d at 67 (citing *Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, [2082], 138 L.Ed.2d 501 (1997)).

■ To evaluate whether the effects of a statute are criminally punitive, courts generally look to the factors set forth by the Supreme Court in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *Rodriguez,* 93 S.W.3d at 68. Those factors include (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has traditionally been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable to it; and (7) whether it appears excessive in relation to the alternative purpose assigned. *Id.* (citing *Kennedy,* 372 U.S. at 168–69, 83 S.Ct. at 567–68).

The court of criminal appeals has twice considered whether certain provisions of Chapter 62 are punitive in effect. In *Rodriguez,* the court held, after applying the *Kennedy* factors, that certain 1997 amendments were nonpunitive. *Rodriguez,* 93 S.W.3d at 67–68. In addressing an Eighth Amendment challenge the following year, the court concluded that "the 1999 version of the [sex offender registration program], like the 1997 version, [was] nonpunitive in both intent and effect" and therefore did not constitute cruel and unusual punishment. *Ex parte Robinson,* 116 S.W.3d at 797–98 ("We have already thoroughly applied the *Kennedy* factors to the 1997 version of the [sex offender registration program] and found it nonpunitive in effect.").

■ D.L. points out that these cases dealt with adult offenders and whether Chapter 62 constitutes cruel and unusual punishment when applied to juveniles is an open question. D.L. argues that juveniles are often treated differently from adults in our laws. He states that, based upon the differences in the maturity and culpability of juveniles and adults, the practice of "shaming" juvenile sexual offenders by public registration is inconsistent with evolving standards of decency in a civilized society. Consequently, he concludes, when applied to juveniles, Chapter 62 is cruel and unusual punishment.

We recognize that children who violate the law are frequently treated less severely than adults who commit the same violation. *See In re M.A.H.,* 20 S.W.3d 860, 865 (Tex.App.-Fort Worth 2000, no pet.). That policy is especially evident in cases such as the one at hand where, although a juvenile commits a crime that would be a first-degree felony if committed by an adult, the juvenile matter, subject to certain exceptions not applicable here, is adjudicated under the Texas Juvenile Justice Code. *See* TEX. FAM.CODE ANN. §§ 51.01–61.107 (Vernon 2002 & Supp.2004–2005). However, the legislature clearly intended to subject juveniles adjudicated for sexually-related offenses to the mandates of the registration and reporting provisions. *See* TEX.CODE CRIM. PROC. ANN. art. 62.12(b)(1). Therefore, as previously stated, D.L. cannot succeed in his challenge here unless he shows that the public registration requirements of Chapter 62 always constitute cruel and unusual punishment when applied to juveniles. D.L.'s first step in meeting that burden is to show that these requirements are punitive. *See Rodriguez,* 93 S.W.3d at 67.

In considering D.L.'s issue, we have carefully reviewed the analysis in *Rodriguez.* We iterate that we must presume

the legislature acted in a constitutionally sound fashion when it enacted Chapter 62. *Id.* at 69. D.L. has not presented any argument to rebut this presumption. Therefore, as to the first prong of our inquiry, legislative intent, we must presume that the legislature intended Chapter 62 to be civil and remedial, and not criminal or punitive, in relation to the claim D.L. asserts here. *See id.* As to the second prong, punitive effect, D.L. does not challenge the *Rodriguez* analysis, but merely asserts that Chapter 62 creates a practice of "shaming" juveniles who are required to register as sex offenders. We interpret this statement as a reference to the first *Kennedy* factor: whether the reporting requirement involves an affirmative disability or restraint.

In *Rodriguez,* the court of criminal appeals stated that when applying this factor, the question is whether the provisions of the statute itself, as opposed to the speculative response of the community, work an affirmative disability or restraint. *Id.* at 71. Any "shaming" that occurs from registration as a sex offender is the result of community response and not Chapter 62 itself. Therefore, any potential public embarrassment of juvenile registrants cannot be considered an affirmative disability or restraint. Moreover, we conclude that the *Rodriguez* analysis and application of the remaining *Kennedy* factors would not differ in the case at hand. Therefore, we hold that, as applied to juveniles, Chapter 62 is nonpunitive in both intent and effect. Because Chapter 62 is not punitive, it cannot constitute cruel and unusual punishment. D.L.'s first issue is overruled.

### Motion to Sever

In his second issue, D.L. urges that the trial court erred in denying his motion to sever the six counts of aggravated sexual assault for separate trials. Cit-

ing Texas Penal Code section 3.04, D.L. acknowledges that he has no right to mandatory severance. *See* Tex. Pen.Code Ann. § 3.04(c) (Vernon 2003) (no right to severance for aggravated sexual assault committed against a victim younger than 17 years of age at time offense committed). However, he points out that the trial court has the discretion to grant a severance if the court determines that the defendant or the State would be unfairly prejudiced by the joinder of offenses. *See id.*

We first note that D.L.'s reliance on section 3.04 is misplaced. The Texas Rules of Civil Procedure govern juvenile proceedings unless otherwise provided. *See* Tex. Fam.Code Ann. § 51.17(a); *In re J.K.R.,* 986 S.W.2d 278, 285 (Tex.App.-Eastland 1998, pet. denied). The Juvenile Justice Code contemplates liberal joinder of offenses, but no specific provision addresses joinder and consolidation of actions. Because no specific provision exists, the Texas Rules of Civil Procedure apply as directed by section 51.17. *Id.*

Texas Rule of Civil Procedure 41 permits the consolidation of suits filed separately and the severance and docketing as separate suits of actions that have been improperly joined. Tex.R. Civ. P. 41. Moreover, actions that involve common questions of law or fact may be consolidated by the trial court. Tex.R. Civ. P. 174(a). A trial court has broad discretion in the matter of severance and consolidation of actions. *Liberty Nat'l Fire Ins. Co. v. Akin,* 927 S.W.2d 627, 629 (Tex.1996). Therefore, a trial court's decision to deny a severance will not be reversed unless it has abused its discretion. *See id.* at 630. When all the facts and circumstances of the case require separate trials in order to prevent manifest injustice, when there is no fact or circumstance that supports or tends to support a contrary conclusion, and when the legal rights of the parties will not

be prejudiced thereby, then there is no room for the exercise of discretion. *In re C.P.*, 998 S.W.2d 703, 710 (Tex.App.-Waco 1999, no pet.) (citations omitted). In that instance, a trial court has a duty to order separate trials. *Id.*

Here, D.L. was alleged to have committed aggravated sexual assault against five victims. Thus, the legal elements of proof were similar for each count of the State's petition. With one exception, the alleged victims were D.L.'s cousins and had at one time lived in the same home with him. Each offense was alleged to have occurred in the family residence or in a "club house" that the children frequented. The cases share common witnesses, particularly since one or more of the alleged victims stated that he had seen D.L. sexually assault other victims named in the State's petition. The cases also share common fact patterns in that the alleged sexual assaults were similar and occurred under similar circumstances. Finally, D.L. has made no showing that evidence of the extraneous offenses would not have been admissible in severed cases. *See* Tex.R. Evid. 404(b) (evidence of other crimes, wrongs, or acts may be admissible for purposes of showing motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident); *see also In re C.P.*, 998 S.W.2d at 711 (likely that trial court's refusal to sever was not an abuse of discretion where evidence of extraneous acts was admissible). Consequently, we hold that the trial court did not abuse its discretion in denying D.L.'s motion for severance. D.L.'s second issue is overruled.

### MENTION OF POLYGRAPH TEST

In his third issue, D.L. complains that the trial court erred in denying his motion for mistrial after Detective Bryan testified that D.L.'s sister, J.L., had taken a polygraph test. The State argues that the curative instruction was sufficient because the test results were not revealed or, alternatively, that any error is harmless.

### Standard of Review and Applicable Law

The overruling of a motion for mistrial should not be disturbed absent an abuse of discretion. *See In re M.R.*, 846 S.W.2d 97, 103 (Tex.App.-Fort Worth 1992), *writ denied*, 858 S.W.2d 365 (Tex.1993). A court abuses its discretion if it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985).

The existence and results of a polygraph examination are inadmissible for all purposes on proper objection. *Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Crim.App.1990). When, in the course of a trial, reference to a polygraph test is made, the court's analysis focuses on whether the results were revealed to the jury. *Id.* Where the defense moves for a mistrial, the sufficiency of an instruction to disregard polygraph evidence usually depends on whether the results of the exam were revealed to the jury. *Id.* Generally, when the results are not revealed, an instruction to disregard is sufficient to cure the error. *Id.* at 683–84. However, the mere mention of a polygraph examination does not automatically constitute reversible error even if the results of the exam are revealed. *See id.* at 684.

When polygraph results are revealed to the jury, an instruction to disregard is insufficient, and the reviewing court must conduct a harm analysis to determine whether the error merits reversal of the trial court's judgment. *Id.* In examining whether the trial court erroneously failed to grant a mistrial, the reviewing court may consider, among other factors, (1) whether the questioning party exhibited bad faith by asking a question designed to elicit polygraph evidence and

(2) whether the evidence impeached the defendant's testimony or defensive theory or bolstered the State's case. *See, e.g., id.* at 684; *Sparks v. State,* 820 S.W.2d 924, 927–30 (Tex.App.-Austin 1991, no pet.); *Stewart v. State,* 705 S.W.2d 232, 234 (Tex. App.-Texarkana 1986, pet. ref'd).

### The Record

The record shows that Sheriff's Detective Tim Bryan conducted the initial interview of D.L.'s grandmother, who reported the alleged sexual abuse. During the investigation, three of the alleged victims reported that D.L.'s sister, J.L., had participated in some of the sexual assaults. J.L.'s accusers were her cousins and also M.L.'s grandchildren.

As a result of the accusations, J.L. was detained, but was released after the children admitted they had fabricated their stories. During his cross examination of Bryan, D.L.'s attorney asked Bryan about the children's recantation of their allegations against J.L. Bryan replied that he did not know about it. D.L.'s counsel again broached the subject later in the cross examination, and the following colloquy occurred:

Q. Now, are you aware that the children recanted and took back the allegations against the sister [J.L.] back in June of this year?

A. I did not know that. I mean, I've heard—I've heard that some of the stories have changed, but I have not heard the specifics about their stories, no, sir.

Q. So you don't have any knowledge of [J.L.] whatsoever?

A. I know that she was arrested and detained for this offense, but I know that she took a polygraph or—

[DEFENSE COUNSEL]: Objection, Your Honor. May we approach the bench?

(Discussion off the record.)

THE COURT: Ladies and gentlemen, I'm going to instruct you to disregard the answer to the last question and not consider it for any purpose. Continue on, [Counsel].

Q. Mr. Bryan, you stated a minute ago that you also had heard that the children had changed their story regarding [D.L.] as well, correct?

A. Yes, sir, I have heard that.

Q. But you have no notice or knowledge of that either?

A. I don't know the specifics of their story, no, sir.

At the conclusion of Bryan's testimony, and outside the presence of the jury, D.L.'s counsel moved for a mistrial. The trial court denied the motion.

### Analysis

■■■ D.L. argues that Bryan's testimony revealed the results of the polygraph test administered to J.L. We agree that the jury reasonably could have inferred from Bryan's answer that J.L. passed a polygraph test. Therefore, we must perform a harm analysis to determine whether reversal is required.

D.L. contends that revealing a potential defendant took a polygraph "can only mislead a jury into the speculation that such a test and its results are routinely available, useful and conclusive." Thus, D.L. concludes the testimony was harmful, arguing, in effect, that under the facts presented here, an instruction to disregard can never cure the harm. We decline to adopt such a rule. Instead, we look to the record to assess the effect of Bryan's testimony.

D.L.'s defense strategy consisted, in part, of an attempt to persuade the jury that the victims fabricated their allegations against him. When D.L.'s counsel cross examined Bryan, who was the State's first

witness, he asked Bryan about the recantation of the allegations against J.L. Bryan responded that he did not know about that. Bryan mentioned the polygraph only after being asked whether he had knew anything "whatsoever" about J.L. Although Bryan's answer may not have been anticipated by D.L.'s counsel, his answer was nonetheless responsive to the question. Therefore, we cannot attribute any bad faith to Bryan.

The State did not call J.L. as a witness. Therefore, the polygraph results did not bolster the State's case because J.L.'s credibility was not an issue. *See Tennard,* 802 S.W.2d at 684 (error harmless where witness whose polygraph results became apparent was neither the sole witness nor even a crucial witness). However, the credibility of the complaining witnesses was a critical issue at trial.

By the trial date, B.S. had changed his story and testified that D.L. did not sexually assault him. B.S.'s mother testified that B.S. told her he lied about the sexual assaults. M.L. testified that she no longer believed the children's stories about D.L., although she admitted she had believed them at first. D.L. testified and denied the allegations. If anything, the polygraph results bolstered all of this testimony and supported D.L.'s defensive theory that the allegations against him were fabricated.

Based upon our review of the record, we hold that the error was harmless. Thus, the trial court did not abuse its discretion in denying D.L.'s motion for mistrial. D.L.'s third issue is overruled.

### Deadly Weapon Finding

In his fourth issue, D.L. argues that the evidence is both legally and factually insufficient to support the jury's affirmative finding that D.L. used or exhibited a deadly weapon (a knife) during the aggravated sexual assault of R.H.

### Standard of Review

In a juvenile case, we review the legal sufficiency of the evidence by considering only the evidence and inferences tending to support the findings of the juvenile court. *In re Garza,* 984 S.W.2d 344, 346 (Tex.App.-Amarillo 1998, no pet.). Evidence and inferences tending to contradict those findings are disregarded. *Id.* In assessing factual sufficiency, however, our focus is not so restricted. *Id.* In that instance, the question is whether the record, considered as a whole, shows that the State sustained its burden to prove beyond a reasonable doubt that the accused engaged in delinquent conduct. *Id.*

### Deadly Weapon

A deadly weapon is a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. TEX. PEN.CODE ANN. § 1.07(a)(17)(A), (B) (Vernon Supp.2004–2005). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. TEX. PEN.CODE ANN. § 1.07(a)(46) (Vernon Supp.2004–2005).

A knife does not qualify as a deadly weapon under subsection (17)(A). *McCain v. State,* 22 S.W.3d 497, 502–03 (Tex.Crim.App.2000). Therefore, in the case at hand the State had the burden to prove that D.L. (1) used or exhibited a knife (2) that in the manner of its use or intended use was capable of causing death or serious bodily injury. *See* TEX. PEN. CODE ANN. §§ 1.07(a)(17)(B),

22.021(a)(2)(A)(iv) (Vernon Supp.2004–2005). D.L.'s evidentiary challenge relates to the second prong: whether the knife was a deadly weapon.

■ Whether a particular knife is a deadly weapon depends upon the evidence presented. *Thomas v. State,* 821 S.W.2d 616, 620 (Tex.Crim.App.1991). Expert testimony is not required to determine the nature of a weapon. *Brown v. State,* 716 S.W.2d 939, 946 (Tex.Crim.App.1986). Nor is it necessary that the weapon be introduced into evidence. *See Morales v. State,* 633 S.W.2d 866, 868 (Tex.Crim.App. 1982); *Gorham v. State,* 985 S.W.2d 694, 697 (Tex.App.-Fort Worth 1999, pet. ref'd). Also, it is unnecessary to show that any wounds were inflicted. *Davidson v. State,* 602 S.W.2d 272, 273 (Tex.Crim.App. [Panel Op.] 1980).

■ Where no actual injury is sustained, the State must present evidence of other factors to establish that a knife is a deadly weapon. *Victor v. State,* 874 S.W.2d 748, 751 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd). Factors to consider in that determination include (1) the physical proximity between the alleged victim and the object; (2) any threats or words used by the accused; (3) the size, shape, and sharpness of the knife; (4) the potential of the object to inflict death or serious bodily injury; and (5) the manner in which the accused allegedly used the object. *Brown v. State,* 716 S.W.2d 939, 946–47 (Tex.Crim.App.1986); *In re K.B.,* 143 S.W.3d 194, 200 (Tex.App.-Waco 2004, no pet.) (citations omitted); *see also Adame v. State,* 69 S.W.3d 581, 584 (Tex. Crim.App.2002) (Meyers, J., concurring). No one factor is determinative, and each case must be examined on its own facts. *Bailey v. State,* 46 S.W.3d 487, 491–92 (Tex.App.-Corpus Christi 2001, pet. ref'd) (citing *Brown,* 716 S.W.2d at 946–47).

*Analysis*

■ R.H. was approximately ten years old at the time of the incident in question. At trial, R.H. did not testify that D.L. had a knife, but stated only that he "might have." R.H. was unsure about other details of the incident and admitted that he was trying to block the details from his mind. However, Detective Tim Bryan, who took R.H.'s statement concerning the incident, read the following portion into evidence:

> We went down to the clubhouse. [D.L.] pushed me around and then he held me. He got some rope and tied me to a chair. Then he pulled out his dick and made me suck it. He had a knife. He told me that if I didn't suck it that I would get cut.

D.L. complains that the State introduced no evidence regarding the size, shape, or sharpness of the knife. Nor did it introduce evidence that showed the potential of the knife to inflict death or serious bodily injury. The State contends, however, that other evidence in the record, combined with reasonable inferences from that evidence, is legally sufficient to support the jury's finding. We agree.

The record reflects that R.H. was approximately ten years old at the time of the incident. D.L. was approximately fifteen. D.L. tied R.H. to a chair and then exhibited a knife, threatening to "cut" R.H. At the time of the threat, D.L. was standing in close proximity to R.H., who was unable to defend himself or escape. R.H. complied with D.L.'s demand. This evidence is legally sufficient to show that D.L. used the knife in such a manner as to convey a threat of serious bodily injury if R.H. did not do as he was told. *See Billey v. State,* 895 S.W.2d 417, 422 (Tex.App.-Amarillo 1995, pet. ref'd) (evidence sufficient if knife is displayed in a manner

conveying an express or implied threat that serious bodily injury or death will be inflicted if the desire of the person displaying the knife is not satisfied). D.L.'s fourth issue is overruled.

### CONDITIONS OF PROBATION

 In his fifth and final issue, D.L. points out that the trial court announced certain conditions of D.L.'s probation in open court, but also stated that "I'm going to require as conditions of probation the standard conditions of juvenile probation." D.L. argues that since no standard conditions of juvenile probation exist, any conditions of D.L.'s probation not announced in open court were imposed by the probation officer. This, he concludes, constitutes an improper delegation of the trial court's authority to impose probation conditions. The State disagrees, citing *Linton v. State*, No. 12–01–00128–CR, 2002 WL 335288 (Tex.App.-Tyler 2002, pet. ref'd) (not designated for publication).

In *Linton*, the trial judge pronounced the sentence, explaining the jail time would be probated "for a period of two years under standard conditions of probation and additional conditions." Defense counsel asked, "How many hours of community service, 32?" The court responded, "Whatever the standard—you're going to have to get with the probation officer as soon as they get here and make sure these conditions are gone over . . . ." *Id.*, at *1. The appellant contended the trial court erred in delegating determination of the specific terms of community supervision to a probation officer. We held that although the trial judge did not, in open court, orally list all conditions of probation to be incorporated into the order of probation, she did not delegate to the probation officer the duty of determining the probation conditions. *Id.* She merely made a ruling and required one of the parties to draft an appropriate order or judgment, which she would sign if it accurately reflected her ruling. The trial judge indicated by signing the document that those were the terms she intended to impose on Appellant. *Id.* The same scenario exists in the instant case. Therefore, the trial court's reliance on the probation department to prepare an order reflecting what it referred to as the "standard" conditions of probation, in addition to the conditions announced in open court, did not constitute an improper delegation of authority. D.L.'s fifth issue is overruled.

### DISPOSITION

Having overruled D.L.'s first, second, third, fourth, and fifth issues, the judgment of the trial court is ***affirmed.***