# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00444-CR

---

**Richard Charles Schmidt, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2017-383, THE HONORABLE STEPHANIE BASCON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Richard Charles Schmidt of the offense of continuous sexual abuse of a young child and assessed punishment at life imprisonment. *See* Tex. Penal Code § 21.02. The district court rendered judgment in accordance with that verdict. In four issues on appeal, Schmidt asserts that the continuous-sexual-abuse statute is unconstitutional as applied to him, that the evidence is insufficient to support his conviction, that he suffered egregious harm from charge error, and that he received ineffective assistance of counsel at trial. We will affirm the district court's judgment.

## BACKGROUND

In a three-count indictment, the State charged Schmidt with continuous sexual abuse of a young child (count I), aggravated sexual assault of a child (count II), and indecency with a child by contact (count III). Count I alleged that Schmidt committed two or more acts of

sexual abuse against victims "Amy Parker" and "Jill Johnson."[1]  Count I alleged three predicate

acts of abuse: (1) intentionally or knowingly causing the penetration of Amy's sexual organ with

Schmidt's hand or fingers; (2) with intent to arouse or gratify the sexual desire of any person,

engaging in sexual contact with Amy by touching her genitals or any part of her genitals with

Schmidt's hand or fingers; and (3) with intent to arouse or gratify the sexual desire of any

person, engaging in sexual contact with Jill by touching her genitals or any part of her genitals

with Schmidt's hand or fingers.

The two predicate acts of abuse against Amy alleged in count I were the same

offenses alleged in counts II and III.  Count II alleged that Schmidt intentionally or knowingly

caused the penetration of Amy's sexual organ with his hand or finger.  Count III alleged that

Schmidt, with intent to arouse or gratify the sexual desire of any person, engaged in sexual

contact with Amy by touching the genitals or any part of her genitals with Schmidt's hand

or fingers.

The case proceeded to a jury trial.  Amy testified that in July 2015, when she was

thirteen years old, she and her family went tubing in the Comal River in New Braunfels.  Amy

was with her mother, her stepfather, and her sister, and before they got into the water, they met

up with Schmidt, who was her stepfather's brother, and two other men.  The group rented tubes,

got into the water, and then went down a "water slide area" that "kind of just shoots you off to

the next part of the river."  Amy "kind of flew in one direction" and was briefly separated from

---

[1]  The names of both victims are pseudonyms.  Amy Parker was the pseudonym used in the indictment to identify the first victim.  A pseudonym was not used in the indictment to identify the second victim.  We have nevertheless used a pseudonym to identify her as well because she was a minor at the time of the offense.  *See* Tex. R. App. P. 9.10(a)(3); *see also* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

the group, "but somebody found [her] and then [they] all kind of got back together" and tied their tubes together. Schmidt's tube was next to and in front of Amy's tube.

Amy recounted that at some point after that, Schmidt "started, like, massaging [her] feet." Amy then switched from sitting on top of her tube to "being under the water" and "kind of swimming." Amy's arms were "over the tube" while her legs were "hanging in the water under the tube." Schmidt was "sitting on top of [his] tube" and continuing to touch her. She explained, "At a certain point, once I put my body under the water, he started trying to get, like, underneath my bathing suit and, like, put his fingers underneath in the crotch area." Amy added, "He got his fingers underneath the bathing suit and then kind of tried to get his fingers inside of me." She could feel his hand on her vagina, "trying to get inside of [her] vagina." Amy kicked her leg, causing Schmidt's hand to move away, but Schmidt continued to try to get his hand inside of her vagina and eventually did so, putting his finger inside her vaginal canal. At that point, Amy "just kind of tried to, like, swim away." She could not remember if Schmidt continued to touch her after that.

That night, the family stayed at a hotel. Amy testified that Schmidt was not supposed to stay in the hotel room with them, but he did. The room had two beds. Amy was sleeping alone in one bed, her mother, stepfather, and sister were sleeping together in the other bed, and Schmidt was sleeping on the floor to the left of Amy's bed. Amy recounted that at some point that night, someone got into the bed with her. She explained,

> We all went to sleep, and I remember kind of, like, feeling pressure on the bed like somebody was trying to get into the bed. And I kind of woke up a little bit and felt like somebody was try—not trying to touch me, but somebody had started going to touch me again.

3

In response, Amy "kind of just, like, scooted over to the other side of the bed and stayed awake for a little bit." Amy believed that the person who had gotten into bed with her was Schmidt, although she acknowledged that she did not see his face. Approximately one year later, Amy told her mother about the abuse, and her mother reported the abuse to the police.

The incident involving Jill occurred after that. Jill testified that in December 2016, when she was thirteen years old, she went over to Schmidt's house for a sleepover with Schmidt's daughter, with whom Jill was friends at the time. Jill recounted that she, Schmidt, Schmidt's daughter, and Schmidt's son "had all settled down for the night" and "had sat down on his couch" to watch movies. Schmidt was sitting next to her, and in the middle of a movie, after Schmidt's daughter and son had fallen asleep, Schmidt "started to touch" Jill. She explained,

> The first initial touch was on my thigh, and very close to my inner thigh going up towards my vagina. . . . He was groping me, grabbing and going into the underneath part of my thigh. . . . He attempted to go under my clothes. I was in a track suit, sweatpants and hoodie. And he had went along the belt lining of the sweatpants, and he had tried to get underneath them. And I had moved his hand away, and then following moving his hand away I had attempted to grab my phone and he pushed my phone away. He slapped my hand. And then he groped my breast on the side, trying to grab full of my breast. And this was on my right side breast because he was sitting to the right of me. He had tried going under my shirt, and then he went back down to my thigh again, and he had grabbed fully in a cupping motion of my vagina and had fully grabbed the outer lips of my vagina.

Jill testified that most of Schmidt's touching, including of her vagina and breast, occurred "over the clothing," although there was "skin-to-skin contact" when Schmidt "went under the belt lining."

Jill further testified that "maybe a couple of minutes" later, Schmidt got up to use the restroom. Jill took that opportunity to text her mother, who lived "right next door" to Schmidt, and asked her to come and get her. In the text message, a copy of which was admitted

4

into evidence, Jill wrote, "Mom please come get me hurry." One minute later, she added, "Please." Jill's mother "flew right over as soon as she got the text" and "pound[ed] on the door," waking Schmidt's daughter and son. Schmidt "stumbled out of the bathroom," "put on a groggy voice and answered the door finally," "trying to act tired to [Jill's] mom." Jill "slipped past him as soon as the door opened," "grabbed her [mother] by her hand and immediately told her [she] wanted to leave." When they returned home, Jill told her mother what had happened, and her mother reported the incident to the police the next morning.

Schmidt testified in his defense and denied ever touching Amy or being near her on the river. Schmidt admitted touching Jill's leg on the night of the sleepover but claimed that the touching occurred accidentally as he was getting up from the couch. Other witnesses for the defense included Schmidt's fiancé, Hope Fischer, who testified that she and Schmidt had attempted to recreate the tubing incident alleged by Amy and that Schmidt had been unable to reach Fischer's private parts at that time and could "barely" touch the outside of her thigh; Adriana Juarez, a private investigator hired by Schmidt's counsel who had also attempted to recreate the tubing incident and who testified that during the recreation, Schmidt was only able to reach her wrist; Matthew Hoyt, the owner and manager of the tubing company that rented the tubes to the group on the day in question and who testified that it would be "highly difficult" for a person sitting in one tube to reach over his tube and then under the tube of a person next to him and touch that person's genitals; Donavin Baldivia, a childhood friend of Amy's who testified that Amy told him that Schmidt had sexually assaulted her in the river but that he did not believe Amy to be an honest person at the time; and Eric Ford, one of the men who was floating in the river with Schmidt on the day of the incident with Amy and who testified that he did not see Schmidt anywhere near a girl while they were in the river.

Schmidt's daughter and son, who at the time of trial were seventeen and fourteen years old, respectively, also testified. Each testified that they were sitting on the couch on the night of the incident with Jill and that they did not see Schmidt touch Jill. However, during the State's cross-examination of Schmidt's daughter, a recording of a forensic interview of her, taken in December 2016 following Schmidt's arrest, was admitted into evidence. During that interview, Schmidt's daughter stated that her father had accidentally touched Jill on the couch that night. When confronted with her statement in the interview, Schmidt's daughter maintained, "I did not see my dad touch [Jill] at all, and I don't recall saying that."

Amy's stepfather testified as a rebuttal witness for the State. He testified that he saw Schmidt and Amy floating next to each other on the river. He also corroborated Amy's account of the sleeping arrangements at the hotel.

At the conclusion of the guilt/innocence phase of trial, all three counts in the indictment were submitted to the jury, which found Schmidt guilty of continuous sexual abuse of a young child as alleged in count I and indecency with a child by contact as alleged in count III. The jury found Schmidt not guilty of aggravated sexual assault of a child as alleged in count II. At the hearing on punishment, the State chose not to proceed on punishment for count III, surmising that because count III involved one of the predicate acts of abuse alleged in count I, a conviction for count III would be vacated on appeal as a violation of double jeopardy. After hearing evidence, including the testimony of two other women who testified that Schmidt had committed acts of sexual misconduct against them, the jury assessed punishment at life imprisonment, and the district court rendered judgment on the verdict. Schmidt later filed a motion for new trial, asserting ineffective assistance of counsel at trial. Following a hearing, the district court denied the motion. This appeal followed.

6

**DISCUSSION**

**Constitutionality of Section 21.02 as applied to Schmidt**

In his first issue, Schmidt asserts that the continuous-sexual-abuse statute is unconstitutional as applied to him. According to Schmidt, it is unconstitutional to apply section 21.02 to "two non-continuous isolated acts against two different complainants, in two different places, and during two different years." In Schmidt's view, "[a]llowing multiple complainants to batch their singular complaints together results in a due process violation as a jury need not unanimously agree upon which victim's story is credible and grounds for a Sec. 21.02 violation."

### *Standard of review*

The constitutionality of a statute is a question of law we review de novo. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007). We begin with the presumption that the statute is valid and that the Legislature did not act arbitrarily and unreasonably in enacting it. *State v. Rosseau*, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013); *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). The party challenging the statute has the burden to establish its unconstitutionality. *Rosseau*, 396 S.W.3d at 557.

A defendant raising an "as applied" challenge "concedes the general constitutionality of the statute but asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011). "Because a statute may be valid as applied to one set of facts and invalid as applied to a different set of facts, a litigant must show that, in its operation, the challenged statute was unconstitutionally applied to him; that it may be unconstitutional as to others is not sufficient (or even relevant)." *Id.*

7

*Analysis*

The statute at issue here, Section 21.02 of the Texas Penal Code, provides that "[a] person commits an offense if during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims." Tex. Penal Code § 21.02(b). Schmidt contends that this language "requires two or more acts of abuse per complainant." Thus, according to Schmidt, "[i]f there are two complainants, four total acts of sexual abuse with at least two acts against each complainant are required." As support for this contention, Schmidt relies on *Price v. State*, 434 S.W.3d 601 (Tex. Crim. App. 2014), and *Cisneros v. State*, 622 S.W.3d 511 (Tex. App.—Corpus Christi-Edinburg 2021, no pet.) (op. on remand). However, neither case supports such a requirement.

*Price* was a double-jeopardy case involving a single victim. The question was "whether the statute defining the offense of continuous sexual abuse of a young child permits a defendant to be convicted both of that offense and of a criminal attempt to commit a predicate offense under that statute." *Price*, 434 S.W.3d at 603. The court concluded that it did not:

> The statutory language reflects that the Legislature intended to permit one conviction for continuous sexual abuse based on the repeated acts of sexual abuse that occur over an extended period of time against a single complainant, even if the jury lacks unanimity as to each of the particular sexual acts or their time of occurrence, so long as the jury members agree that at least two acts occurred during a period that is thirty or more days in duration.
>
> . . . .
>
> The statutory language further reflects that the Legislature clearly intended to disallow dual convictions for the offense of continuous sexual abuse and for offenses enumerated as "acts of sexual abuse" when based on conduct against the

8

> same child during the same period of time. . . . We conclude that the statutory language is plain in providing that, when the acts alleged were committed against a single child, the Legislature did not intend to permit dual convictions for continuous sexual abuse and for an enumerated act of sexual abuse unless the latter occurred during a different period of time.

*Id.* at 605-06 (internal citations omitted). Thus, in that case, the court concluded that the defendant could not be convicted of both continuous sexual abuse and attempted aggravated sexual assault of that same child. *Id.* at 604, 611. The court in *Price* said nothing about the permissibility of a conviction for continuous sexual abuse when there are two victims and the State proves one act of abuse per victim, which is what occurred here.

Although *Cisneros* involved two victims, it is also not on point. In that case, the defendant was convicted of two counts of continuous sexual abuse, one against each victim. *Cisneros*, 622 S.W.3d at 516-17. The defendant argued that two convictions violated double jeopardy. *Id.* at 520. The court concluded that it did not, reasoning that "[i]f the Legislature intended to prohibit multiple § 21.02 prosecutions in cases with multiple victims, or if it intended to prohibit multiple § 21.02 prosecutions relating to the same time period irrespective of the number of victims, it could have easily done so, but it did not." *Id.* at 521. The court then held that "the unit of prosecution for continuous sexual abuse is a series of acts of sexual abuse 'that occur over an extended period of time against a single complainant.'" *Id.* (quoting *Price*, 434 S.W.3d at 605-06). Thus, *Cisneros* stands for the proposition that multiple convictions for continuous sexual abuse, each involving a single complainant, are permitted under Section 21.02. *Cisneros* did not address the permissibility of a single conviction involving multiple complainants.

9

However, the plain language of the statute clearly permits such a conviction by providing that "[a] person commits an offense if . . . the person commits two or more acts of sexual abuse, *regardless of whether the acts of sexual abuse are committed against one or more victims.*" Tex. Penal Code § 21.02(b) (emphasis added). Nevertheless, Schmidt contends that such a conviction is unconstitutional because it violates the requirement of jury unanimity.

"Texas law requires that a jury reach a unanimous verdict about the specific crime that the defendant committed." *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011). "Unanimity in this context means that each and every juror agrees that the defendant committed the same, single, specific criminal act." *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005); *see Jacobsen v. State*, 325 S.W.3d 733, 736 (Tex. App.—Austin 2010, no pet.). "There is, however, a crucial distinction between a fact that is a specific actus reus element of the crime and one that is but the means to the commission of a specific actus reus element." *Jacobsen*, 325 S.W.3d at 736. "The jurors must unanimously agree on each element of the crime in order to convict, but the jurors need not agree on all the underlying facts that make up a particular element." *Id*. "When alternative manners and means of committing an offense are submitted to a jury, it is appropriate for the jury to return a general verdict of guilty if the evidence supports a conviction under any one of them." *Id*. (citing *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)).

"There are two components to jury unanimity analysis." *Id*. (citing *Jefferson v. State*, 189 S.W.3d 305, 311-14 (Tex. Crim. App. 2006)). The first component is a question of statutory construction: "Under the statute as written, what . . . . did the legislature intend for the jury to be unanimous about?" *Id*. (citing *Valdez v. State*, 218 S.W.3d 82, 84 (Tex. Crim. App. 2007); *Jefferson*, 189 S.W.3d at 311-12). The second component is a question of due process:

10

"The United States Constitution limits a state's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition." *Id*. at 736-37 (citing *Richardson v. United States*, 526 U.S. 813, 820 (1999)). For example, due process would not permit a jury to convict a person of a crime "so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering . . . would suffice for conviction." *Schad v. Arizona*, 501 U.S. 624, 633 (1991) (plurality opinion).

In *Jacobsen v. State*, this Court considered the constitutionality of section 21.02 with the above questions in mind and concluded that the statute does not violate the jury unanimity requirement. 325 S.W.3d at 736-39. Regarding the statutory-construction question, this Court explained that "under the plain language of section 21.02, it is the commission of two or more acts of sexual abuse over the specified time period—that is, the pattern of behavior or the series of acts—that is the actus reus element of the offense as to which the jurors must be unanimous in order to convict." *Id*. at 737; *see* Tex. Penal Code § 21.02(d) ("The jurors must agree unanimously that the defendant, during a period that is 30 days or more days in duration, committed two or more acts of sexual abuse."). On the other hand, "[t]he individual acts of sexual abuse that make up this pattern of behavior or series of acts are not themselves elements of the offense, but are merely evidentiary facts, the manner and means by which the actus reus element is committed." *Jacobsen*, 325 S.W.3d at 737. In other words, "section 21.02(d) makes it clear that the jurors need not agree as to which individual acts were committed so long as they agree that the defendant committed at least two." *Id*.; *see* Tex. Penal Code § 21.02(d)

11

("[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed.").[2]

This Court further concluded that "it is consistent with due process for the legislature to criminalize a pattern of conduct consisting of the commission of two or more sexually abusive offenses over a period of time without requiring the jury to unanimously agree about the individual offenses the defendant committed." *Jacobsen*, 325 S.W.3d at 737. This was because "crimes involving sexual abuse of children" present "special difficulties of proving individual underlying criminal acts," and section 21.02 was designed to address those difficulties. *Id*. (citing *Richardson*, 526 U.S. at 821). Additionally, the "acts of sexual abuse" prohibited by section 21.02 were similar to each other and thus presented less of a due-process concern: "All of the 'acts of sexual abuse' involve actual or threatened sexual abuse, assault, or exploitation of children. All of the acts are either first or second degree felonies. All are morally equivalent, and they are largely similar conceptually." *Id*. at 739. For these reasons, this Court concluded "that section 21.02 does not violate due process by permitting a conviction based on a jury's unanimous finding that the defendant engaged in a course of conduct consisting of repeated acts of sexual abuse, but without requiring jury unanimity as to the individual acts that

---

[2] We note that the court's charge to the jury tracked the language of the statute regarding unanimity:

> In order to find the defendant guilty of the offense of Continuous Sexual Abuse of a Young Child, you are instructed that members of the jury are not required to agree unanimously on which specific acts of sexual abuse, if any, were committed by the defendant or the exact date when those acts were committed, if any. However, in order to find the defendant guilty of the offense of Continuous Sexual Abuse of a Young Child, you must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse, as that term has been previously defined.

12

made up that course of conduct." *Id*. This Court has followed *Jacobsen* on at least two occasions, *see Nunez-Quijada v. State*, No. 03-17-00791-CR, 2019 WL 5199263, at *2-3 (Tex. App.—Austin Oct. 16, 2019, no pet.) (mem. op., not designated for publication); *Martin v. State*, 335 S.W.3d 867, 871-73 (Tex. App.—Austin 2011, pet. ref'd), and other courts have reached similar conclusions regarding the constitutionality of section 21.02, *see, e.g.*, *Navarro v. State*, 535 S.W.3d 162, 165-66 (Tex. App.—Waco 2017, pet. ref'd); *Ingram v. State*, 503 S.W.3d 745, 748 (Tex. App.—Fort Worth 2016, pet. ref'd); *Fulmer v. State*, 401 S.W.3d 305, 313 (Tex. App.—San Antonio 2013, pet. ref'd); *McMillian v. State*, 388 S.W.3d 866, 872-73 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Kennedy v. State*, 385 S.W.3d 729, 732 (Tex. App.—Amarillo 2012, pet. ref'd); *Casey v. State*, 349 S.W.3d 825, 829 (Tex. App.—El Paso 2011, pet. ref'd); *Reckart v. State*, 323 S.W.3d 588, 600-01 (Tex. App.—Corpus Christi-Edinburg 2010, pet. ref'd); *Render v. State*, 316 S.W.3d 846, 857-58 (Tex. App.—Dallas 2010, pet. ref'd).

Although this case is slightly different than the above cases because the question here is whether multiple victims violate the jury-unanimity requirement, as opposed to multiple acts of abuse, we believe that similar reasoning applies. Each "act of sexual abuse" must be committed against a particular victim. If the jury need not unanimously agree on the "act of sexual abuse" the defendant committed, then it follows that the jury also need not unanimously agree on the victim against whom an "act of abuse" was committed. This is consistent with "the evident purpose" of Section 21.02, which is "to facilitate the protection of vulnerable young children from sexually predatory adults." *Ramos v. State*, 636 S.W.3d 646, 655 (Tex. Crim. App. 2021). Thus, in this case, so long as the jury unanimously found that Schmidt committed one act of sexual abuse against Amy and also one act of sexual abuse against Jill, then the jury

13

unanimously found that the defendant committed two or more acts of sexual abuse during a period that is 30 or more days in duration. *See id*. at 656 ("[T]he jury need not even be unanimous with respect to which predicate offenses were committed, or when they were committed; they need only agree that at least two such offenses were committed over a greater-than-thirty-day period."). We conclude that Schmidt's constitutional rights were not violated here.

We overrule Schmidt's first issue.

## Evidentiary sufficiency

In his second issue, Schmidt asserts that the evidence is insufficient to prove that he committed two or more acts of sexual abuse as required to support his conviction for continuous sexual abuse. Specifically, he argues that the evidence is insufficient to prove either of the two acts involving Amy. He does not challenge the sufficiency of the evidence regarding the incident with Jill.

### *Standard of review*

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id*. "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id*. "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id*., and are "free to apply

common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Furthermore, reviewing courts "measure the sufficiency of the evidence by the so-called hypothetically correct jury charge, one which accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *See DeLay v. State*, 465 S.W.3d 232, 244 n.48 (Tex. Crim. App. 2014). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320).

*Analysis*

As discussed above, a person commits the offense of continuous sexual abuse of a child if, during a period that is 30 or more days in duration, the person commits two or more acts

of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims, and each victim is a child younger than 14 years of age. Tex. Penal Code § 21.02(b). The term "act of sexual abuse" includes the offense of indecency with a child by contact, *id.* § 21.02(c)(2), which occurs when the actor "engages in sexual contact with the child or causes the child to engage in sexual contact," *id.* § 21.11(a)(1). "Sexual contact" includes any touching by a person, including touching through clothing, of "any part of the genitals of a child," if committed with the intent to arouse or gratify the sexual desire of any person. *Id.* § 21.11(c)(1).

The record in this case supports the jury finding Schmidt committed two acts of sexual abuse. First, Jill testified that Schmidt touched her genitals on the night of the sleepover in December 2016, specifically by "fully grabb[ing] the outer lips of [her] vagina," and Schmidt does not dispute the sufficiency of this evidence to prove that he committed the offense of indecency with a child against Jill.

Second, Amy testified that Schmidt touched her genitals while her family was tubing together on the river in July 2015. She recounted that her tube and Schmidt's tube were next to each other, and at some point while they were tubing, Schmidt "started, like, massaging [her] feet." After that, Amy switched from sitting on top of her tube to "being under the water" and "kind of swimming," with her arms "over the tube" while her legs were "hanging in the water under the tube." Schmidt continued to touch Amy, and she explained that when she put the lower area of her body under the water, Schmidt "started trying to get, like, underneath [her] bathing suit and, like, put his fingers underneath in the crotch area," getting his fingers "underneath the bathing suit" such that she could feel his hand on her vagina, "trying to get

16

inside of [her] vagina." Amy testified that Schmidt eventually was able to put his finger inside her vagina.

Schmidt contends that the version of events described by Amy was "physically impossible." Emphasizing the recreations of the incident that he attempted with his fiancé Fisher and his counsel's investigator Juarez, Schmidt asserts that the defensive evidence shows that "a person of Appellant's size sitting in a tube cannot reach over and into the middle of another tube from underneath." This evidence included Fischer's testimony that based on her attempt to recreate the incident with Schmidt, she believed it would be impossible for somebody to touch someone else's private parts when both people are in tubes; photographs of Schmidt and Juarez sitting next to each other in tubes (on land), with Schmidt reaching his arm toward Juarez's tube and barely being able to reach the underside of Juarez's tube; and the testimony of Hoyt, the owner of the tubing company, who said that it would be "highly difficult" for a man sitting in one tube to stick his hand over his tube and underneath a neighboring tube to touch the private parts of a woman sitting in that tube.

However, it was for the jury to decide the credibility of Amy's account of the incident. Although Fischer and Juarez testified that they believed it was not possible for Schmidt to reach their private parts during their recreations of the incident, that does not mean it would have been impossible for Schmidt to reach Amy's genitals during the actual incident. Hoyt did not testify that it would be impossible for the contact to occur, only "highly difficult." The jury could have reasonably inferred that Schmidt, who Amy testified was repeatedly trying to touch her genitals despite her kicking his hand away, eventually overcame that difficulty. Moreover, the jury was free to disbelieve Fischer's and Juarez's testimony regarding the extent of Schmidt's reach. As for the photographs showing the attempted recreation of the incident by Juarez and

17

Schmidt, that recreation was on land rather than in the river, and Juarez's legs were on the tube rather than underneath it. Thus, the jury could have reasonably inferred that the photos did not depict an accurate recreation of the incident. Amy testified that she was moving her legs underneath the tube, "kind of swimming," which the jury could have reasonably inferred had provided Schmidt with easier access to the lower part of her body. At any rate, the jury was presented with conflicting views of the evidence, and we are to defer to the jury's resolution of that conflict in favor of the State's theory that Schmidt touched Amy's genitals as alleged. On this record, we conclude that the evidence is sufficient to prove that Schmidt committed an act of sexual abuse against Amy. Thus, there was sufficient evidence that Schmidt committed two acts of sexual abuse, one against Jill and one against Amy, both of whom were younger than 14 years of age at the time of the abuse, during a period that was 30 or more days in duration. Accordingly, the evidence is sufficient to support Schmidt's conviction.

We overrule Schmidt's second issue.

**Charge error**

For purposes of the continuous-sexual-abuse-of-a-child statute, an "act of sexual abuse" includes the offense of indecency with a child by contact, but only "if the actor committed the offense in a manner other than by touching, including touching through clothing, the breast of a child." Tex. Penal Code § 21.02(c)(2). The jury charge in this case did not instruct the jury that touching a child's breast was excluded from the definition of "act of sexual abuse." In his third issue, Schmidt asserts that this caused him egregious harm.

*Standard of review*

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). First, we must determine if there is error in the charge. *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). "If there is error, then a harm analysis must be conducted." *Id*. If the defendant objected to the charge at trial, "the record need show only 'some harm' to justify reversal of the conviction." *Id*. (quoting *Almanza*, 686 S.W.2d at 171). However, if the defendant failed to object, "the error will not result in reversal of the conviction without a showing of egregious harm." *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015).

Schmidt did not object to the charge in the court below. Thus, "reversal is required only if the error was fundamental in the sense that it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id*. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id*. (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). "In examining the record to determine whether charge error has resulted in egregious harm to a defendant, we consider (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole." *Reeves*, 420 S.W.3d at 816.

*Analysis*

"Trial courts are obliged to instruct juries on 'the law applicable to the case,' which includes the statutory definitions that affect the meaning of the elements of the offense." *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011) (citing *Villarreal v. State*, 286 S.W.3d 321, 329 (Tex. Crim. App. 2009)). In this case, the charge failed to instruct the jury that the statutory definition of "act of sexual abuse" excluded touching a child's breast. Consequently, the charge was erroneous. Because Schmidt did not object to this error in the court below, we must next determine if this caused him egregious harm.

First, we consider the entirety of the jury charge. A jury charge generally contains abstract paragraphs and application paragraphs. "The abstract paragraphs serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). "The application paragraph is what explains to the jury, in concrete terms, how to apply the law to the facts of the case." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013). "We look at the wording of the application paragraph to determine whether the jury was correctly instructed in accordance with the indictment and also what the jury likely relied upon in arriving at its verdict, which can help resolve a harm analysis." *Id.*

Here, the abstract portion of the charge failed to expressly exclude touching a child's breast from the definition of "act of sexual abuse." However, the application paragraphs of the charge did not authorize the jury to convict Schmidt based on conduct that included touching a child's breast. Instead, consistent with the language used in the indictment, the application paragraphs authorized a conviction only if Schmidt committed two or more acts of

sexual abuse by either penetrating Amy's sexual organ, contacting Amy's genitals, or contacting

Jill's genitals:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 11th day of July, 2015, through on or about the 9th day of December, 2016, RICHARD CHARLES SCHMIDT, hereinafter styled Defendant, committed two or more acts of sexual abuse against Amy Parker and [Jill Johnson], said acts of sexual abuse having been violations of one or more of the following penal laws:

> Aggravated sexual assault, to-wit: the said RICHARD CHARLES SCHMIDT, did then and there, intentionally or knowingly cause the penetration of the female sexual organ of the said Amy Parker [Pseudonym] with the hand or fingers of the said RICHARD CHARLES SCHMIDT,

> Indecency with a child, to-wit: the said RICHARD CHARLES SCHMIDT, did then and there, with intent to arouse or gratify the sexual desire of any person, engage in sexual contact with the said Amy Parker [Pseudonym] by touching the genitals or any part of the genitals of the said Amy Parker [Pseudonym] with the hand or fingers of the said RICHARD CHARLES SCHMIDT,

> Indecency with a child, to-wit: the said RICHARD CHARLES SCHMIDT, did then and there, with intent to arouse or gratify the sexual desire of any person, engage in sexual contact with the said [Jill Johnson] by touching the genitals or any part of the genitals of the said [Jill Johnson] with the hand or fingers of the said RICHARD CHARLES SCHMIDT . . . .

> then you will find the defendant guilty of the offense of Continuous Sexual Abuse of a Young Child as charged in Count I of the indictment and so answer on the verdict form provided.

Thus, even though the abstract portion of the charge did not instruct the jury that breast touching

was excluded from the definition of "act of sexual abuse," the wording of the application

paragraphs, by not mentioning breasts at all, precluded the jury from convicting Schmidt based

21

on anything other than either penetration of a child's sexual organ or contact with a child's genitals.[3]  This weighs against a finding of egregious harm.

Turning to the state of the evidence, most of the evidence in the case involved Schmidt's alleged contact with Amy's and Jill's genitals.  Amy's testimony regarding the incident at the river was focused solely on Schmidt touching her lower body and her vagina, and she provided no testimony at all regarding any touching of her breasts.  Although Jill provided testimony that Schmidt touched both her breast and her genitals, the more detailed testimony involved the touching of her genitals, with Jill recounting that Schmidt "grabbed fully in a cupping motion [her] vagina and had fully grabbed the outer lips of [her] vagina."  The State emphasized this testimony.  Moreover, the defensive theory of the case was not that Schmidt touched only Jill's breast.  Rather, Schmidt's theory was that he accidentally touched Jill's leg as he was getting up from the couch and that Jill was lying about everything else.  Thus, this was not a case in which the jury likely would have found that Schmidt touched Jill's breast but not her vagina.  The state of the evidence weighs against a finding of egregious harm.

Regarding the arguments of counsel, the State in its closing argument referred on three occasions to Schmidt touching Jill's breast.  However, on each occasion, the State immediately thereafter also mentioned Schmidt's contact with Jill's genitals:

> And on December 9th of 2016, he tried to touch on [Jill's] breast and he touched her vagina.

---

[3]  Schmidt asserts that "[i]n common parlance, touching of the breasts is considered touching of a sexual organ" and that because the term "genitals" is not defined anywhere in the charge, the jury "may" have conflated the touching of a child's breasts with the touching of a child's sexual organ.  Schmidt provides no authority for this contention.  Moreover, even if such confusion was possible, a finding of egregious harm requires actual rather than theoretical harm, and there is no indication in this record that the jury conflated breasts with genitals.

> [Jill] gets on the stand and tells you, yeah, things started to get weird. You know, he's sitting next to me. He's trying to put his hands down my pants. He's trying to put his hands on my breast. He's putting his hand on my inner thigh. And then he cups my vagina. He touches the outer lips of my vagina.

> But [Jill] was very clear, even on cross-examination, no, this is what happened to me. He tried to touch my breast. He actually groped it. And then he tried to touch my inner thigh. . . . And then he touched me again, and this time he cupped my vagina. He cupped the outer lips.

Also, when the State summarized the acts of abuse that could form the basis for Schmidt's conviction, it did not mention breast touching:

> But when we look at it, the legislature set up that any of those separate acts, whether it's penetration of [Amy's] vagina, whether it's touching of [Amy's] vagina, or it's touching of [Jill's] vagina, those are all ones that you can agree.

> . . . .

> And so when we apply it and we look at it, the indictment tells you, this is what the State has alleged. We've alleged that Richard Schmidt penetrated the vagina of [Amy], we've alleged that he touched the vagina of [Amy], and we've alleged that he touched the vagina of [Jill]. He was over 17 and they were under 14.

We also observe that defense counsel did not mention breast touching in his closing statement, attempting instead to cast doubt on Amy's testimony regarding the river incident and Jill's testimony regarding the touching of her vagina. We conclude that this factor weighs slightly against a finding of egregious harm.

Finally, regarding any other information in the record, the State discussed the relevant statutes during jury selection and explained that the touching of a child's breast was not included as an act of abuse under the continuous-sexual-abuse statute:

23

For purposes of this section, acts of sexual abuse means any acts that is a violation of one or more of the following Penal laws: Indecency with a child under 21.11(a)(1), which we'll go over that. But for purposes of continuous, it can't be touching of the breasts.

. . . .

So we're talking about the specific statute for indecency with a child, it's the anus, breasts or any parts of the genitals of a child. For purposes of continuous, you'll notice breast is not included.

. . . .

So it's two different statutes. You've got the continuous statutes, which encompasses indecency, and then you have separately, the indecency statute. So the differences are the age of the child, and then for continuous, breast is not included.

This factor weighs against a finding of egregious harm.

In sum, all four factors weigh against a finding of egregious harm. Accordingly, on this record, we cannot conclude that Schmidt was egregiously harmed by the error in the charge.

We overrule Schmidt's third issue.

**Ineffective assistance of counsel**

In his fourth issue, Schmidt asserts that his trial counsel provided ineffective assistance. Specifically, Schmidt asserts that counsel: (1) inadvertently waived his right to make an opening statement; (2) failed to object during the State's closing argument to the State's references to Jill's testimony regarding the touching of her breast; (3) failed to call two defense

24

witnesses; and (4) failed to request an instruction regarding the exclusion of breast touching from the continuous-sexual-abuse statute.[4]

### Standard of review

Evaluating claims of ineffective assistance of counsel involves a two-pronged test: (1) whether counsel was deficient, and (2) whether the defendant suffered prejudice as a result of counsel's error. *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).

"To establish that counsel's actions were deficient, the appellant must show, by a preponderance of the evidence, that counsel's actions fell below an objective standard of reasonableness." *Hart*, 667 S.W.3d at 781. "Courts should consider the reasonableness of counsel's actions at the time, rather than viewing such actions through the benefit of hindsight." *Id*. "The Court should make this determination in light of all the circumstances in order to determine if the actions fall outside the wide range of professionally competent assistance." *Id*. "Counsel performs deficiently if he has 'made errors so serious' that it cannot be said he functioned as the 'counsel' guaranteed by the Sixth Amendment." *Ex parte Salinas*, 664 S.W.3d 894, 909 (Tex. Crim. App. 2022) (quoting *Strickland*, 466 U.S. at 687).

Regarding the second prong, "deficient performance is prejudicial only if those errors were so serious as to deprive the defendant of a fair trial, that is, a trial whose result is reliable." *Id*. (citing *Strickland*, 466 U.S. at 687). Appellant "must show that, but for counsel's

---

[4] We note that of these four issues, the only one that was discussed at the hearing on Schmidt's motion for new trial was the failure to call witnesses. The remainder are being raised for the first time on appeal.

25

deficient performance, there is a reasonable probability that the result of his trial would have been different, a reasonable probability being one sufficient to undermine confidence in the outcome." *Id*. (citing *Strickland*, 466 U.S. at 694).

*Analysis*

## Waiver of opening statement

After the State rested its case-in-chief, the district court asked counsel if he "would like to begin with an opening [statement] . . . or call [his] first witness." Counsel chose to recall Amy and Jill to the stand and elicited more testimony from them. After that, counsel informed the court, "I'd like to go ahead and make an opening statement." The court asked the parties to approach the bench and informed counsel, "So when you first started, I gave you the option to either start with an opening statement or calling your first witness. You called your first witness." Counsel responded, "So I can't do an opening statement?" The court asked the State if it objected, and the State did, arguing that it would be "inappropriate" for counsel to make an opening statement after having called two witnesses. The district court agreed, and counsel made no opening statement.

Assuming without deciding that the above constitutes deficient performance, we cannot conclude on this record that it satisfies the prejudice prong of *Strickland*. The failure to make an opening statement is generally considered harmful to the defendant in complex cases where the facts are complicated and the jury might find the defense difficult to understand without explanation or clarification by counsel. *See, e.g.*, *McGowen v. State*, 25 S.W.3d 741, 748 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). This was not such a case. It involved three alleged acts of abuse involving two victims. Each victim testified at trial and described the

alleged abuse. The defensive theory of the case was that each victim was lying, and this strategy was apparent before the defense presented its case, including when counsel cross-examined each victim and attempted to cast doubt on their accounts of the incidents. The jury did not need an opening statement to understand the defensive theory in this case. On this record, there is not a reasonable probability that the result of Schmidt's trial would have been different if counsel had not waived his opening statement. *See Linson v. State*, No. 04-00-00632-CR, 2002 WL 1573424, at *4 (Tex. App.—San Antonio July 17, 2002, no pet.) (not designated for publication).

### Failure to object to closing argument

As discussed above in Schmidt's third issue, the State in its closing argument mentioned on three occasions Jill's testimony that Schmidt touched her breast. Schmidt asserts that counsel was ineffective in failing to object to this argument because it left the jury with the impression that it could convict Schmidt based on that touching.

Proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019). "An attorney's failure to object to proper argument cannot be ineffective assistance." *Ibarra v. State*, 456 S.W.3d 349, 358 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

By mentioning Jill's testimony that Schmidt touched her breast, the State was summarizing the evidence presented at trial. At no point did the State argue that the jury could convict Schmidt based on the alleged breast touching. To the contrary, the State argued that the jury could convict Schmidt based on his touching of Jill's vagina. Because the State's argument

27

was a proper summation of the evidence, we cannot conclude that counsel was ineffective for failing to object to it. *See Davis v. State*, 830 S.W.2d 762, 766 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd).

### Failure to call witnesses

Schmidt further contends that counsel was ineffective for failing to call two witnesses: Paula Hanson, Schmidt's mother and Amy's step-grandmother, and Officer Leah Sipe of the Waller Police Department, who interviewed Jill the day after Schmidt touched her. At the hearing on the motion for new trial, Hanson testified that she believed Amy to be a liar and had caught her "lying on several occasions." Sipe was not present at the hearing on the motion for new trial, but Schmidt attached her police report to his motion. In the report, Sipe states, among other things, that Jill told her that "the assault did not go any further than" Jill's "upper leg and thigh area" and that "there was not any penetration." Schmidt argues that if counsel had called these witnesses to testify, the jury would have been presented with "even more evidence that the single instance stories of the complainants were exaggerated or incredible."

"To show deficient performance by trial counsel based on an uncalled witness, an appellant must show: (1) that witness would have been available to testify; and (2) that witness's testimony would have been of some benefit to the defense." *Ex parte Sanchez*, 667 S.W.3d 324, 329 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). "To meet the availability requirement, proposed witnesses must testify or swear in an affidavit that they were available to testify at the defendant's trial." *Id*. Additionally, as with other ineffective-assistance claims, the appellant must also demonstrate a reasonable probability that if the witness had testified and provided

28

testimony of "some benefit" to the defendant, the result of the trial would have been different. *See Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010).

As an initial matter, we observe that the availability requirement does not appear to have been satisfied for either witness. At the hearing on the motion for new trial, Hanson testified that she would not have been available to testify at Schmidt's trial because her husband was in the hospital at the time for "end-stage renal failure," she was his only caregiver, and she "could not leave him." As for Officer Sipe, there is nothing in the record regarding her availability, as she did not appear at the hearing on the motion for new trial or provide any affidavit stating that she would have been available to testify.

Moreover, even if either witness had been available to testify and provided testimony beneficial to Schmidt, we cannot conclude that there is a reasonable probability that the result of the trial would have been different. Hanson would have testified regarding her belief that Amy was not truthful, but Amy's childhood friend, Donavin Baldivia, had already testified for the defense that he believed Amy "wasn't an honest person" at the time she made her accusation against Schmidt and that, in his opinion, Amy was a liar. If the opinion of Amy's friend at the time of the incident did not sway the jury to disbelieve Amy, we cannot conclude that there is a reasonable probability that the opinion of the defendant's mother, who the jury likely would have viewed as biased toward her son, would have made a difference in the outcome of the trial.

Regarding Officer Sipe, if she had been called as a witness, she likely would have testified not only to Jill's statement regarding the lack of penetration but also to the other statements that Jill made to her regarding the incident. According to the police report, Jill told Sipe that on the night of the incident, she was watching a movie at Schmidt's house with

29

Schmidt's daughter and Schmidt's brother when Schmidt "sat down next to her on the couch," "began to touch her on her leg and upper thigh area," and then "groped [her] breast." Jill also told Sipe that Schmidt pushed Jill's cell phone away from her when she first tried to use it and that she was able to use her phone to text her mother when Schmidt left the living room to use the bathroom. These statements were consistent with Jill's trial testimony. The State never alleged and Jill never testified that Schmidt "penetrated" her; the State's allegation was that Schmidt "engag[ed] in sexual contact with Jill by touching her genitals or any part of her genitals," and Jill testified that Schmidt touched the outer lips of her vagina. Although Jill's testimony regarding the extent of Schmidt's touching was more detailed than her statement to Officer Sipe that Schmidt touched her "leg and upper thigh area," we cannot conclude that there is a reasonable probability that if Sipe had testified to what Jill had told her, the jury would have had a reasonable doubt regarding Schmidt's touching of Jill's vagina.

### Failure to request instruction on breast touching

Finally, Schmidt asserts that counsel was ineffective by failing to request an instruction specifying that the continuous-sexual-abuse statute excluded breast touching as an "act of abuse." Assuming without deciding that counsel was deficient in failing to request that instruction, we cannot conclude that there is a reasonable probability that the result of Schmidt's trial would have been different if counsel had requested the instruction. As we explained in our discussion of Schmidt's third issue, the application paragraphs in the charge instructed the jury to convict Schmidt of continuous sexual abuse if the jury found that he committed two out of three of the following acts of abuse: penetrating Amy's sexual organ, contacting Amy's genitals, and contacting Jill's genitals. Thus, the court's charge, even without the instruction, did not

30

authorize a conviction for breast touching. Additionally, the State explained during jury selection that the continuous-sexual-abuse statute did not include breast touching, and the State argued in its closing that the indictment alleged and the jury could convict Schmidt based on his penetration or touching of Amy's vagina and his touching of Jill's vagina. The State did not argue that the jury could convict Schmidt for touching Jill's breast. Thus, we cannot conclude on this record that there is a reasonable probability that if counsel had requested the instruction on the exclusion of breast touching from the continuous-sexual-abuse statute, the result of the trial would have been different.

We overrule Schmidt's fourth issue.

## CONCLUSION

We affirm the judgment of conviction.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: February 23, 2024

Do Not Publish

31